The United States Court of Appeals for the Federal Circuit is now open and in session. The State of the United States and this Honorable Court. Good morning, please be seated. The first case for argument this morning is 15-1284 New Evolution v. Pedersen. And I understand the appellants are splitting the argument, so we're running the clock for you each individually. May it please the Court, I'm Jonathan Fryman. On behalf of New Evolution and the counsel table is Richard Pizer on behalf of Peter Rasmussen addressing the issue specific to Mr. Rasmussen. We've also reserved five minutes for rebuttal in addition to the divided time here. Your Honors, 10 years ago in the Voda case, this Court held that our courts should not determine the validity and infringement of foreign patents. This case raises the flip side of that question, whether foreign courts can determine substantive issues of U.S. patent law. And it's a flip side that Voda saw coming. Voda based his decision in part on concerns of reciprocity, that if U.S. courts determine substantive issues of foreign patent law, then foreign courts could make determinations regarding substantive issues of U.S. patent law. And that would have said... And what's wrong with that? I'm sorry, Your Honor? What's wrong with that? Well, as Voda put it, foreign courts exercising jurisdiction over claims based on U.S. patents would destroy Congress's intent to foster uniformity. But we don't look into the inventorship of a case that's filed based on an international patent, do we? Our patent office? We look at the U.S. patents that are issued. They may derive from a previous PCT application. They may trace their priority to that PCT application. But United States courts look at United States patent substantive issues. I don't remember, and I don't believe that you cited any cases in which that had been an issue. And to try and understand how dispositive such a question might be, as you know, there are all sorts of international rules, international comedy, international procedures that accommodate property rights in various countries. That's correct, Your Honor. As Voda explained, in fact, the grant of patent rights is a sovereign grant within the territory of the sovereign. And for one sovereign to reach into another sovereign's territory and make determinations about that other sovereign's unique grant of property, in fact, violates comedy. That was one of the core concerns of Voda. Precisely. And therefore, what's wrong with the Danish court deciding who the inventor is? Well, what's wrong with that is that the Danish court is then reaching into the U.S. sovereign's territory and making determinations regarding U.S. intellectual property rights within the territory of the U.S. And that's the exact problem that Voda identified. What if the parties were to agree that they would be bound by the determination in the Danish court with respect to inventor rights? Well, Your Honor, first of all, that hasn't happened here. But second of all, that would cause independent concerns other than the territorial and reciprocity and sovereignty concerns identified by Voda. It would also mean that if a foreign court is making determinations about substantive questions of U.S. patent law, well, then the uniform federal patent law that Congress meant to create is put in the hands of a foreign court. Well, it's not making determinations about substantive patent law. It's making its own determination, and then the parties are agreeing to be bound by that for purposes of enforcing the U.S. patent. Well, it's making determinations regarding inventorship of a U.S. patent. And the inventorship of a U.S. patent, this court has identified as something that is of public interest. It has multiple consequences aside from whatever implications of ownership may flow from the determination of inventorship. For instance, one of the purposes of the correct inventors being on the patents are that people can reach out and see who's coming up with a new subject matter and collaborate. They can, in fact, advance the useful arts, as the patent clause says. That's the very purpose of it. So the correction of inventorship is important for that. It's also important because if there are going to be continuation applications, you need to have the right inventor on the continuation application, and it needs to be consistent with the prior patent. So if the prior patent is wrong, there's a problem. Well, can I ask you, what's the status of the Danish litigation now? Well, that's outside the record, Your Honor. But to my understanding, the status of the Danish litigation right now is that the court of first instance has made the determination that the 2007 settlement agreement bars litigation of the issues in Denmark. That's on appeal in the Danish High Court right now. There's a proceeding scheduled for next month at which that court will determine whether to remand to the court of first instance. I should say that that all deals with new evolutions claims. Mr. Rasmussen's claims have not been addressed at all as of yet by the court of first instance in Denmark. And if this were to be heard by the U.S. Patent Office and by the court, the adjudicatory system here in the U.S., what effect, if any, would any settlement agreement, would they be required to construe the settlement agreement in terms of whatever they're deciding with respect to inventorship? Well, certainly one of my opponent's claims is that the settlement agreement bars the consideration of whether inventorship should be corrected. And we explain that that's not so for two reasons. One is that under the Lear decision, a no-challenge clause to the inventorship of a U.S. patent, especially here where it's entered into before the U.S. patent even issued, is contrary to public policy. But that's an issue that would have to be adjudicated here, too, even though the same issue is being adjudicated. The Danish courts are reviewing the impact of the settlement agreement. As a matter, if the courts here in the PTO were to review your inventorship claim, they would necessarily or likely have to construe the settlement agreement as a threshold issue? Yes, Your Honor. The important point there is that the Danish courts are not considering the U.S. public policy enunciated in Lear against no-challenge clauses of this sort. And that's exactly the sort of reason why VOTA says those foreign courts shouldn't be deciding U.S. patent issues, because that Danish court decision under the no-challenge clause could undermine the public policy identified by the U.S. Supreme Court in Lear. So that's the very core of the problem, Your Honor. But what's the harm in allowing the Danish proceeding to play out and resolve whatever issues are there? Issues relating to the invention, who made the invention in Denmark? Issues relating to the contract? Issues relating to your client's rights under that contract? And then, depending upon how that falls out, you're not foreclosed to come back to the United States, either in a district court proceeding or before the patent office, to get inventorship resolved? Well, Your Honor, of course we do ask that the foreign non-convenience dismissal be reversed. But in the event this court were to affirm the dismissal, we have asked that the court specifically do what the Fourth Circuit did in the Campagna Naviera case, which is to say explicitly that if the foreign court does not reach the substantive issue, then we do have a right to come back in this court. We're not asking for this court or any court to stay the Danish proceedings. The Danish proceedings are going forward on the European and Danish patents. But you're not foreclosed, as things stand right now, you're not foreclosed from coming back after the Danish proceeding is resolved? Well, there are – in fact, the question, Your Honor, of the res judicata or collateral estoppel effect of a foreign non-convenience dismissal is not clear, either in this circuit or the Fourth Circuit. And there have been district court cases that have said – I'll give you one quick example, one called INRI, I believe it's West Caribbean Airlines, where the Southern District of Florida had a case where it dismissed it in lieu of litigation in France. They then filed in France. It went up to the French Supreme Court. The French Supreme Court said, no, we don't have jurisdiction because you filed first in the U.S. They then came back to the Southern District of Florida and said, look, France isn't an available alternative forum. And the Southern District of Florida said, well, we don't defer to the French Supreme Court. Our previous decision is binding, and so you can't bring the claim. So that sort of concern is why we ask that if you were to affirm, which, of course, we hope you won't, that you would condition it explicitly on our ability to come back on the merits of inventorship if, in fact, the Danish court… Even if we agree with you on forum non-convenience, don't you have a standing problem? Well, we don't have a standing problem, Your Honor. I believe the core of the standing issues are directed to Mr. Rasmussen rather than New Evolution. We clearly have a claim to ownership… Oh, I think there's a standing problem with New Evolution as well, isn't there? Well, Your Honor, we clearly have a claim to ownership in the Danish courts under Danish law and under a Danish contract if, in fact, the inventor is Peterson and not Rasmussen. So that is a – that's a clear financial interest that we have that gives us the concrete injury and the redressability through this court's decision of – or the district court's decision correcting inventorship. No, but that question – you would need to establish in the district court both that Mr. Peterson is the inventor and that you have the right under the agreement to ownership of that U.S. patent. Is that right? I don't believe that's correct, Your Honor. I don't believe there's any case ever saying that in order to have standing, you must be able to achieve the financial benefit in this particular proceeding as opposed to in another proceeding. So whereas here there are different parts of the dispute that are properly resolved in different countries, we have the financial interest that will occur in Denmark if inventorship changes in the U.S. But your injury for standing has to be immediate and direct and redressable. Well, it is, Your Honor, in that – our injury is that… It's not redressable in the district court because the district court can't resolve the question of ownership. That's correct. The district court cannot resolve the question of ownership, but it is still redressable in the sense that if Peterson is declared the inventor, we then have a right that we can seek to vindicate in the second forum. But is it correct that the parties no longer are in dispute as to who the correct inventors are? No, Your Honor, there is a lot of dispute as to that. We assert that Peterson is the correct inventor and that Rasmussen being listed as the inventor was simply procured by fraud, something that Rasmussen himself has acknowledged in his affidavit. Well, I'll ask – the other side is insisting that Dr. Rasmussen is the inventor. I'll inquire of counsel. I'll leave that to opposing counsel, Your Honor. Thank you. Thank you. Thank you. So you're taking three minutes on behalf of Mr. Rasmussen? Yes, Your Honor. Thank you. May it please the court, my name is Rick Beiser and together with Tiffany Wyman, we represent Dr. Rasmussen in this case. The issue for Dr. Rasmussen, as the court has alluded to, is whether or not he has a standing. This court in the Shoup case decided after the proceedings were held in the district court and the district court rendered its decision that a reputational injury by itself may suffice for an injury in fact. In this case, Dr. Rasmussen has suffered a reputational injury. That injury is an injury in the fact that he is associated in the United States by being listed as the inventor of the 381 patent, as the inventor of the patent, which he is not. That's a reputational injury. It affects public recognition. It affects his vocational leverage and perhaps his pecuniary gain. In the Pedersen case, relied on by the appellee in this case, the District of Maryland, said that in that case was not the appropriate case to recognize a reputational injury from being listed as the inventor. This case is markedly different from that case. Why doesn't he just clear the air, file a paper with the patent office, and say I'm not the inventor, remove me from this patent? I believe, Your Honor, that he has filed an affidavit to that effect, and this matter being in litigation, I believe that that has forestalled that opportunity to do so. But if it weren't in litigation, if we were to affirm the district court here, does that mean that the patent office could entertain his affidavit? I'm not sure, Your Honor. I don't know the answer to that. I think that if for one reason, it depends on the reason that the court affirms, but if he doesn't have standing to address the injury, then I wonder whether the patent office could entertain it. It sounds a little odd to me. I mean, you're trying to reverse the district court and to get into district court on this case, but you're saying that that is arguably, or at least possibly, impeding your client's ability to get the only relief he's seeking, which is to get his name off the patent as an inventor. Do you understand my question? I'm not sure that I do, Chief Judge. I think you represented that arguably, at least, the fact that we're in district court and that issue hasn't been resolved could arguably be precluding your client from going straight to the patent office and getting the relief that he seeks overall, which is just to get his name off of the patent. So that strikes me as a little circuitous way of getting what you want, right? Well, I think it's our understanding that because the district court has thrown out the issue of inventorship on foreign known convenience grounds, that while that matter is still pending there or here, that we cannot go to the patent office and simply say, change the name on the inventorship. That's my understanding. And what if we were to affirm what the district court did? Would that give you the ability then to go to the patent office and get your name off? Well, we'd certainly try to do that, but I'm not sure that we would be successful in doing that because there would be, in effect, a ruling that, in fact, the inventorship stands. But it's an international application. So if the Danish court resolves this question, which from what the trial judge said here, all the parties are Danish citizens, they're all there, they can appear, all arguments can be heard. But if the international application has a correct inventorship, isn't that a straightforward procedure then under 256 to correct the US inventorship in the office without going through this complicated judicial process? Your Honor, I would rely on the argument that Mr. Frymer made with respect to that. I think there is still an issue of whether or not a court in Denmark, however it resolves inventorship over there, can decide inventorship here. So my argument is the same as his in response to your question. So you're saying that the case on appeal here was wrongly decided with a deference to the Danish court? I'm sorry, I don't understand your question. With respect to the finding in the Danish court of first instance was wrongly decided? You say that Dr. Rasmussen has standing. I want to understand what it is that you're asking us to do. Are you asking us, this court, the Federal Circuit, to decide whether he is or is not an inventor? He's already sworn on every document I've seen that he's not an inventor. So I'm not sure what you're asking us to decide. I'm asking you to remand the case to the district court so that the district court can entertain whether or not there's subject matter jurisdiction outside the pleadings as it can. Take evidence on whether or not there's subject matter jurisdiction to determine whether or not he suffered an injury in fact and whether or not it is redressable caused by Dr. Peterson and redressable. When the court decides that, then it can address the issue that we believe should be straightforward as to who the actual inventor is. And with the determination there, then we can take it back to the public record of the United States and the Patent Office and have listed who the true inventor is. Why don't we hear from the others? Thank you. Mr. Smith? Thank you, Your Honor. As you know, I represent the defendants below, Dr. Henrik Peterson and Kam Jean Olden. And Judge Newman, let me see if I can answer one of the questions that you were looking for correction on. There's no longer a dispute as to who the correct inventor is. That is still a disputed issue in Denmark. Disputed in what way? As to what is your client's position? My client's position is that the principal inventor on the invention covered by this patent is Dr. Rasmussen. Dr. Peterson worked with Rasmussen on certain aspects of it. And I think you'll see when you look at the pleadings that are filed in the Danish case that what Rasmussen is actually looking for, or New Evolution as well as they're paired up here, they're looking to establish Peterson either as the inventor or the co-inventor. So even they and their pleadings have allowed for the possibility that Dr. Rasmussen is a co-inventor on it. So it's still a disputed issue. So is this all about whether or not New Evolution under whatever employment contract they think they have with your client that they can get ownership of the patent? Let's go back to first principles. And if we start with foreign non-convenience, I think this is a textbook case for that. I don't think there's any dispute here. If there wasn't this patent element, which is the tail wagging the dog here, if there wasn't this patent element, the issues between these three parties would all be resolved and should be resolved in Denmark. You have three Danish entities now in a dispute over an employment agreement, which was struck in Denmark between Danish parties. It's written in Danish and it has a foreign selection clause that says this has to be decided in Denmark. Well, what is the potential for the Danish court to do with respect to the inventorship question in the United States? It has to decide the issue that Judge Lynn has spotted, which is it has to decide the condition preceding to New Evolution coming into the United States and petitioning to change inventorship. That's the question of ownership. And the whole appeal here centers around the question of are we here on an inventorship issue or are we here on an ownership issue? Wait, are you talking about a connection with standing? Yes, with standing. So you're saying that we need to wait to see what the Danish courts do to even establish standing. So is that the only reason you're here fighting whether or not they ought to be able to adjudicate the inventorship rights of the U.S. patent here in the U.S. courts? Yes, well, when we first started this case, remember, this was a case in which the complaint was framed as ownership, ownership, ownership. That's what they were fighting over and that's the nature of the claim they filed in the Eastern District of Virginia. One count to change the name of the inventor, but two counts, one for conversion, one for unjust enrichment, all premised on the notion of ownership. And the decreed paragraph or the addendum clause said we want this court in the Eastern District of Virginia to decide ownership as well as inventorship, but ownership, declare New Evolution to be the owner. We said, look, that question is before the court in Denmark. It was New Evolution that started that case in Denmark. And it's been proceeding for a year and a half and now you come to the United States and you ask a U.S. court to decide the question of ownership. But as you acknowledge, whether it's everything they've asked for in the U.S. or one of the things, one of the things is certainly the inventorship question of the U.S. patent. That's what they're asking the court here to resolve. And do you agree that the Danish court doesn't have the authority to make that determination? I do not. It has the authority, and this actually answers another question of Judge Newman. It has the authority to tell the parties before it to direct them to do something. I agree that they can't tell the Patent and Trademark Office in the United States, you have to change the inventorship. But certainly it can tell Dr. Peterson, you have to change the ownership or you have to work with New Evolution. We're not talking about the ownership. But the Connecticut court couldn't order the Virginia court to do anything. Can the Danish court resolve the underlying factual issues relating to inventorship of the U.S. patent? Yes, the Danish court is being asked to do that. So if the Danish court rules on inventorship of the U.S. patent under U.S. patent law principles and then directs the parties to take steps to effectuate the change of inventorship in the U.S., doesn't that resolve the question? It would seem to, in my mind, Your Honor, yes. But isn't that problematic? The Patent Office is being told that all foreign courts could adjudicate the inventorship of U.S. patents under U.S. law, which is what our courts have the authority to do, and then force the parties to effectuate that foreign determination through our courts and through the Patent Office. Doesn't that sound problematic to you in terms of the way these things ought to work? It does not because in many, many, many cases where litigants start off in the United States and are dismissed to a more appropriate forum abroad, that is the practical outcome. But if you're troubled by adopting some general rule that a Danish court can make a determination that will be binding somehow on a U.S. court, then we're not asking for that. We're not asking for that. In theory, you're asking to effectuate the same result by leaving it to the Danish court to have the authority to order the parties to do something in the United States. Your Honor, this happens all the time outside of the patent context. Well, let's assume hypothetically that in inventorship we have some unique jurisprudence that has you have to meet these five tests and this is how you have to adjudicate it. Let's assume the Danish court reaches that question but doesn't apply our precedent at all. You're still saying that, yes, it's OK. They don't get to adjudicate it in the United States and then the parties are going to, in essence, be compelled to act in the United States to change inventorship, whereas that issue has been adjudicated under principles that are contrary to the ones we apply in our courts. Well, I'm going to start by challenging the core assumption, which is that there is a difference between U.S. inventorship and Danish inventorship. But how do we know that? You want us to adjudicate that? Are you saying that in order to resolve this case, we have to adjudicate that issue and make the determination there's no difference in the law they apply in order to... You do not. OK. You... So why does it matter? We're not going to take your word for it. It's either something we would have to adjudicate in the first instance here or not. No, you don't need to create the problem that is the hypothetical that you pose. I appreciate the hypothetical and I understand what is giving you pause. But the simple answer here is the question of standing. In order for new evolution to challenge the inventorship, it has to show an actual injury. It cannot... there are standing requirements under Article 3. And the only... and this is where the cart before the horse issue comes up. Plaintiff says this is an inventorship case, pure and simple. And they're just playing to the music of that's a nice federal patent issue and that's why it has to stay here because, after all, the U.S. Patent Office runs its own set of rules. But it's not that simple. Ownership has to be decided first. You cannot get to the question of inventorship without first resolving the question of ownership. And if new evolution is ruled to have no interest in this invention or the patents that originated, the original Danish patents against which we claim the first priority, then there is no standing here. And there's the case... But it can have... its interest depends entirely on whether Peterson is a sole or joint inventor. Does it not? Yes. New evolution has no rights at the moment as an owner of the patent unless it decide... unless it can demonstrate to the court in Denmark that Peterson was the inventor, number one, and number two, and therefore it fits within the scope of the employment agreement. So you see we have these two issues that are going to have to be... threshold issues to be resolved by a Danish court. One of them is construing an employment agreement to see whether any of the activity that Dr. Rasmussen mentions in his affidavit constitutes activity that fits within the employment agreement. So are you saying that we wait for the Danish court to make that determination, and if they determine there is some ownership, then they have... that gives them standing to proceed in the U.S. courts with respect to the inventorship question? I am. And let me just cite the court... So you're not saying that they're foreclosed or that it is not appropriate for the U.S. courts to determine inventorship under the patent. You're just making a temporal argument that you have to wait and see about this threshold issue being resolved before they can do that? I agree with you. That is the practical overlay. And then for the... for precision's sake with... and following up with Judge Lynn's question, there's a standing issue which makes it even easier for you to resolve the case. I want to go back to inventorship for a minute, and we talked about having the Danish court resolve the questions, the factual issues underlying inventorship of the U.S. patent. Our case is pretty clear that the state courts are preempted from doing exactly that. In other words, the parties cannot go to a state court and ask the state court to resolve underlying issues relating to inventorship. That's preempted. Why should it be any different? And the reasoning, the rationale for that is to avoid lack of uniformity in application of these somewhat nuanced laws relating to inventorship. Well, why should there be any difference with respect to a foreign court? Well, here it's not the... remember that these are patents that originate with an underlying Danish patent, and all the patenting that's being done in Europe as well as in the United States all flows directly. This is... Judge Newman started with that question. They flow directly from that originating patent. Yeah, but the fact that the invention originated in Denmark doesn't mean that a different law of inventorship applies. If a different law of inventorship applies, then you're right. They should have the ability to challenge the outcome. I guess I should be saying I have the right to challenge the outcome. I mean, you can't be arguing that Danish law applies to inventorship of a U.S. patent. So the fact that the invention originated in Denmark doesn't make any difference in terms of the question of inventorship. That needs to be resolved by a U.S. court or the patent office under U.S. law. And that is... that, I submit, is a temporal issue to pick up on that hypothetical. It's a matter of timing. It doesn't make sense here because they may have no rights at all to appear in the court, any court in the United States, if they don't have an interest... if New Evolution does not have an interest... So why couldn't the court here... is there something that would preclude the court here from determining... I mean, obviously, if the case is appropriately before the court here on the question of inventorship, they have to also determine threshold issues with respect to standing. What's wrong with that? Because to get to that, they have to decide the ownership issue. And that issue is being litigated in Denmark between Danish parties and will be determined on the application of a Danish employment agreement. And so in that setting... But why would the court here be compelled to accept or be bound by that determination by the Danish court in terms of its determination with regard to standing? A U.S. court... if we take away the inventorship issue and only focus on ownership, a U.S. court must honor the determination that the Danish court makes. That's fundamental comity. And remember, this is... we're not forcing anybody to do anything here. Judge Hilton decided, in the case below, that he would exercise his discretion and dismiss the case so that the Danish court could make the important threshold rulings, particularly the ruling regarding ownership, regarding whether the statute of limitations has run, and whether or not New Evolution waived its claims to this patent and agreed that it would not challenge the patent. That issue is before the court in Denmark. And in fact, in the five years that have passed since that case was decided, as you've heard, the Danish court has said that the settlement agreement bars New Evolution from bringing these cases here in the United States. So now that's challenged on appeal. That's outside the record. I recognize that. But that demonstrates why Judge Hilton was right. This is an abuse of discretion standard.  He dismissed it and sent it back to Denmark so that all this groundwork could be resolved of these important questions of Danish law. Has there been waiver? Has there been settlement? Is the statute of limitations run on this claim? They can decide the inventorship issue. And if they decide against my client, then that issue is... necessary to correct inventorship if it's needed here in the United States, or it will be subject to a fresh challenge, but at least there will be the full record of what happened in Denmark. And as the case... So you acknowledge it will be subject to a fresh challenge and that that challenge would appropriately occur? Yes, only if they're standing. And I just want to be sure that we're clear on that standing issue because Judge Lynn is right. It's the Larson case that you had before you in 2015. In that case, the patented item was a wakeboard tower that they used behind a boat. And the putative inventor, Larson, had assigned away his rights. So it's sort of similar here. They didn't have the rights at hand. And this court said, unless and until Larson obtains equitable relief that restores his ownership rights, he has no standing to bring a standalone action under 256. His only path to financial reward under 256, that's our change of inventorship statute, in this case involves him first succeeding on his state law claims and obtaining rescission of the patent assignments. So I submit that the Larson case is a perfect analogy for what we're doing here. New Evolution has to go back to Denmark and establish its rights first. And then we'll see where the parties stand. And it can come into court. And that's exactly why Judge Hilden exercised his discretion in dismissing the case on foreign nonconvenience grounds. Thank you. Could I have just take one minute to address reputational injury because it's a very unusual. What we have here with Mr. Rasmussen is strictly a reputational injury standing position. He has no financial interest in the outcome of any of this. He signed away. He has a waiver or an indemnity, rather, from New Evolution that says, I'm going to indemnify you against any possible claim. And that's in the record at Joint Appendix 151. Your position is that that indemnity provision protects him against the claim for attorney's fees and costs. Yes. And I was a little shocked that that's been part of the record, this indemnity provision, since the beginning. Even on reply, they don't mention that indemnity letter. It establishes that there's no exposure to any claims by my client against me. So it's strictly a reputational injury. And we have this very odd and somewhat perverse situation of the reputation that he's alleging is I'm wrongly named as something. I am an included inventor rather than an excluded inventor. And I know this court has always been reluctant to deal with reputational injury alone as being a claim that got resolved in the Shook case. I agree. But the Shook case was an excluded inventor. There's a lot of rewards and pecuniary benefit that we get from being an inventor. That's not the case here. Rasmussen is saying I just don't want to be named as an inventor. That's a hypothetical injury. It's what that Maryland court said. No, that's not enough. You can't just call this being an inventor an albatross. Thank you, Your Honor. Okay. Thank you. Okay. We'll restore five minutes for rebuttal. Thank you, Your Honor. I just want to start with the standing issue, and I've been authorized to make things easier so we're not jumping up and down, just to respond to one quick point for Dr. Rasmussen. The fact that there's an indemnification clause doesn't somehow erase the fact that there's exposure. The indemnifying party here at New Evolution could be bankrupt, could just choose not to live up to its contractual obligation. The ultimate obligation, the financial obligation at Denmark, still rests on Dr. Rasmussen, so it's both financial and reputational. Standing as to New Evolution, standing is, of course, based on what's alleged in the complaint. This is a motion to dismiss. What's alleged on the complaint here is that New Evolution suffers damage because under both Danish statutory law and the employment agreement, it would have ownership rights if Peterson were the inventor. That's all that's required is the allegation and the complaint. I want to move to really the substance of this, which is whether— It's not that he would have ownership rights or New Evolution would have ownership rights. It's that New Evolution would have a claim to ownership. Isn't that right? That's right, Your Honor, but the fact that that claim— But that's different. That's different, isn't it? Well, the only difference is whether both of those things are occurring in the same forum or not. But still, at the end of the day, New Evolution— if the only thing New Evolution has is a claim and not an absolute right. In other words, New Evolution does not possess an assignment from Peterson. It just has an employment contract with a provision that might apply. And the operation of Danish statutory law, similar to the Bayh-Dole Act, Your Honor. Yes, but again, there's no case that says you have to get it all in one shot. That if you can't get all of the relief that you're seeking, if that can't all be redressed in one shot, then you don't have standing. No, but the injury has to have some immediacy. Well, it is immediate in that we know that there are proceedings regarding ownership in Denmark. And the determination of a U.S. court regarding inventorship is a necessary predicate to the claim of ownership. Inventorship has to come before ownership. And the Larson case that opposing counsel mentioned is different because Larson wouldn't have a claim to ownership even if he were the inventor. So that's a factual distinction in that case. I do want to turn to this notion that somehow the Danish courts can compel Peterson and parties to come before the U.S. Patent Office to correct the inventorship of this patent. And Chief Judge Prost, as you mentioned, that would be odd because the Danish courts might not apply U.S. law the right way. Certainly this court would have no supervisory review power over the way that the Danish court was employing inventorship law, U.S. inventorship law. And I want to turn to a question also that you asked, Judge Newman, regarding, well, you know, he's filed all these things saying he's not the inventor. Why can't he just go to the Patent Office and do that and we'll be done with this? Taking a step back, Section 256 has two clauses. The first clause allows correction by just going to the PTO, but you have to have, as it says, it has to be on application of all the parties. One individual can't go there and say, here's my paper. Yes, I had assumed that by now the parties had resolved between themselves, but you will have that resolution from the Danish court. Well, Your Honor, that goes back to the question of, does the Danish court have the power to determine U.S. inventorship law? But it relates to the international application. Yes, but let me point to a case involving an international application that this court decided just last year, the Lismont case. The Lismont case involves a U.S. patentee. Based on the international application. Yeah, well, the European patents flow from an international application in that case as well. And in that case, there's litigation brought in Germany, and he loses. The patentee loses in Germany. And then in the United States, he brings claims as well, seeking to correct inventorship. Well, now, if the international application, the Danish court, decides that either this is a joint invention or it's the sole invention of Dr. Pedersen, I gather it's no longer on the table that it's the sole invention of Dr. Rasmussen. Is that right? Well, Your Honor, as has been discussed here, the different nations' substantive laws of patent differ. And there is not an assumption that Danish patent law is the same as U.S. patent law. That wasn't my question. My question is, what's before the Danish court? What's before the Danish court right now are the questions of the inventorship of the European patents as well as the international applications. Is that what's before the Danish court? The first application that was filed was filed in Denmark. Correct. Is that right? Is that what's before the Danish court? It was filed as the sole invention of Dr. Rasmussen. And this, now, I gather everyone agrees, is incorrect, that it's either a joint invention or it's the sole invention of Dr. Pedersen. No, Your Honor. That's not something that the parties agree on at this point. Opposing counsel continues to take the position that Rasmussen is the sole inventor. So that's still before the Danish court, that Rasmussen is the sole inventor, despite the affidavit that he's filed, that he's not the inventor? That's correct. Yes. That's correct. And, Your Honor, the notion that a Danish court could determine inventorship and could compel the parties to go before the PTO to correct inventorship says that if any court has personal jurisdiction and the contempt's power, that's enough to order parties to go before the PTO. As Judge Lynn, as you identified, that would mean that the Connecticut court could do that. That would mean the courts of Delaware. If the courts of Delaware can't do that, why can the courts of Denmark do that? If this court has made clear and Congress has made clear that federal patent law and federal inventorship law is meant to be uniform and supervised only by this court, then it's not something to be decided by the courts of Delaware or the courts of Denmark. But what do you make of the fact that the original application that was filed was filed in Denmark and the U.S. application was based upon that? It's my understanding, Your Honor, that there are differences in terms of the claims, in any event, between the patents. But there is plenty of authority, which we've cited in our briefs, saying that the mere fact that a determination is made with regard to a substantive issue of patent law under another nation's patent laws, even if it flows from the same PCT application, that's not binding in the U.S. There is not collateral estoppel effect. There is not res judicata effect. It's something for the U.S. courts, U.S. federal district courts, to determine in the first instance. What are the substantive requirements of U.S. patent law, and how do they apply to the facts of this case? But can there be a difference of inventors as between an international application and the U.S. application based thereon? Sure. There could be different standards for inventorship, where one country could say, well, if someone is coached along to develop something, that's okay, they can still be the inventor. Where another nation, ours, might say, no, they actually have to be the one who conceives of it in the first instance, and otherwise it's the other person. So these are national questions. To go back to VOTA, these are questions that are within the sovereign prerogative of each nation determining the intellectual property rights within its own borders. Do you know of any case that addresses that? I'm not going to call them offhand, Your Honor, but we do have a couple of them cited in our briefs. Okay. Thank you. We thank both sides, and the case is submitted. Thank you, Your Honor.